Good morning. My name is Anthony Lilley. I'm here on behalf of the appellants, the plaintiffs below. They are merchandisers named Paige Lee, Brand Mixer, Business Moves Consulting, and Curtis Boardnave. Like the defendants' appellees, they sell merchandise emblazoned with all manner of fun and fanciful stuff. In this case, as your honors are aware, the trademark, which my clients have a registered trademark, VI Love is at issue. There is no other registered trademark. There are pending applications. There are also arguments of common law rights. Do all of your claims depend on the superiority of Business Moves purported mark over the universities? Not at all, your honor. I'm sorry. I think I jumped the gun. I'm sorry. Can your honor repeat that? Do you have to have a superior mark over the Well, the universities are non-parties here. What we do need to prevail is to have a superior mark over the infringers. But we're trying to figure out if the university was the required party. We're trying to figure out if they are involved in this in such that the district court did or did not make a correct determination in that regard. So whether or not ultimately for you to win, you still have to beat the university matters. Maybe matters. Maybe you don't think it does. I disagree because on this record, we're not even sure. If you looked at the, if you look at the, your honors look at the licensing agreement at tab six, there's no indication that any of this indicia existed when the agreement was entered into. There's no indication of the I love. It all predates the supposed first use by Jackson State, which was in 2010. This agreement was entered into in 2007. That's a factual sort of quibble that this appeal is not based on, but it's real. The problem with the ruling below is that for the first time ever, we have a compelled joinder of a joint tortfeasor and the basis for doing that is a claimed interest. And for the first time, the next level of that is, and we see, you've seen, your honors have seen the cases we've had to cite. I cited a 1974 case from Ohio, a district court. None of this stuff is particularly on point. There's really not a case. Every single case involves registered users, compelled plaintiff participation. And so I think there's three central principles here. We have to draw from, or your honors are asked to draw from, the stuff that we all know is real. And one is the 2003 Fifth Circuit ruling, HS Res Inc. This was a natural gas royalties case. It's at 327 F. 3rd 432. Basic principle number one, joinder is not required unless judgment effectively precludes a non-party from enforcing their rights and they are injuriously affected by the judgment. Here, Jackson State, who by way of mention, has not come on record as indicating at all that they're interested. CLC has indicated that they are interested, but there are certain courts, most recently the Hotaling case, that District of New Jersey case. Some of these courts think that matters, that when the non-party is just sort of a puppet or here, a university shield, maybe this isn't really the meaning of 12B7. So the point being is that Jackson State, if we assume that it is interested, and it hasn't come on record here to say that it's interested, if we assume that its interest is real, that we can do before USPTO, which it can do before TTAB, which it can do in a federal district court, it could do any of these things. And it is not . . . Do we know what the status of the ongoing dispute between the university and business moves and the USPTO is? Is that in this record? It's not in the record. There was a move to supplement the record, which I oppose. There's been a move to have the court judicially recognize that, which I think is inappropriate as well. But when I wrote your honors in my 28J letter, I kind of regretted that because I think that's really great evidence that, when I say that, I think that the progress in USPTO and TTAB, I think that progress is great evidence that there's no injury to Jackson State here at all. Counsel, what's the nature of the mark that Jackson State has registered under state law for the vanity plates? Those are . . . Your Honor, when you ask what the nature is . . . Yeah, like is that . . . I'm assuming it's some sort of state registration requirement. State registered mark. I believe they have a mark and a mark plus design. So could you prevail, could your clients prevail in this lawsuit without affecting Jackson State's state law mark for the vanity plates? I believe we could because I think that as the . . . I think it's the Jet Ink case, which was a federal circuit case from 2000. That's a 223 F. 3rd, 1360. Now, that case is about the interplay between a district court infringement case and TTAB rulings. It's a great, it's a really good, and I wish that I had prepared more to discuss that case, but it basically explains that it's almost like you never step in the same river twice. It's almost like that. What I mean by that is that it's absolutely possible that my clients could prevail and all they have to do is, in one instance, say, you know what, we have a registered mark and you, some of your gear has the little R, the registered mark. That's not proper. You don't have the right to do that. They could prevail there and then, and without Jackson State being involved at all. The facts of this stuff change so often. Just like in the TTAB proceeding, it's absolutely possible Jackson State could prevail, have our mark canceled after an infringement judgment has been entered, not against Jackson State, but against the actual folks who are doing the infringing. Here, and I pointed this out in sort of my temple argument, which was in order for a necessary party to be identified, you have to have a cause of action against that party, and there's nothing in the record. We don't have any, there's no, we have two affidavit, two declarations from Jackson State employees. There's no evidence that they are selling anything. There's also no evidence that they've licensed the I Love or that they were even aware that these things were being sold with the R mark on it. So my point with that is, is that essentially all of this can take place simultaneously, and it is. All of this is taking place simultaneously, and it may be that this is a valueless case. So you don't think that any of the things that Jackson State is doing with its state registration infringes your mark, your federal mark at all? We don't know what Jackson State is doing. We only know what, we have no idea what Jackson State is doing. There's nothing in the record that indicates they're doing anything. Even the licensing agreement, not to be redundant, but even the licensing agreement is silent as to the I but it's been amended twice. There's no reference to future, it's all marks that have come to be known with Jackson State. And when these agreements were made, you know, there's none of the use, which has been admitted by Jackson State, their first declared use in their own trademark papers is 2010. All these agreements predate that. So, so somebody took the design of the vanity plate to which Jackson State unquestionably has a state mark. I'm sorry? Suppose somebody takes the design of the vanity plate to which Jackson State unquestionably has the mark, starts making t-shirts and so Jackson State sues them to vindicate their state well rights to the mark. Do you think Jackson State could win that lawsuit and you can win your lawsuit at the same time? Absolutely. And how? Well, because, because Jackson State has a mark that is superior to whoever the defendants would be. Well, we have a mark that is superior to the proper defendants here. It probably doesn't matter that it's exactly the same mark. No, it doesn't. No. What would be your best case for that? What's it, what's a good example of that ever happened? You, you, you've absolutely worked me into a corner. I have no best case for that. My best, my best case is, my best case on the, on the broad issue, which we've explained, uh, there are very few, uh, of these sort of on all fours, but I've already given you the HS Rez case. Um, obviously, uh, some of the, the district court cases, the, the Pearson case, which I, which I, I think does a great job, that was a northern district of Texas case, um, basically talking about what's a claimed interest. And it's not a someday interest. It's a right now interest. And the record here just doesn't support, doesn't support what Jackson State has done to protect this right, this right. And, and, and more importantly, uh, it, it, it is not going to be affected. It can, it can basically abstain from participation in this case. It can proceed in USPTO and it may be quicker. Uh, it may, it, it seems to me it will be affected if you can cut off all of the income that Jackson State receives from marketing its slogan. And that's what the, uh, certainly the indirect effect of this case would be, if not the direct effect. Well, well, Your Honor, I think that some of the, the, the sort of the, the inchoate rights cases, something like the Pearson case, for instance, what they're saying is, is that, uh, if this litigation, say, destroys a contract that Jackson State is party to, or it destroys its right to protect a trademark or something like that, that is when, uh, Jackson State becomes Rule 19A necessary. Uh, the, the, the mere sort of possibility that there'll be a squabble or that, that, uh, that there'll be a squabble, that's what Rule 19A requires. And, and I think... But this clearly, I mean, to me, it's clearly a first step toward making these next moves that ultimately will have the effect of destroying the viability of the, of the slogan for Jackson State. One of the, one of the great, uh, advantages that Jackson State has is that, uh, its refusal to participate in a case like this will not be used against it, uh, over at USPTO or TTAB. It can do nothing at all. It will not be punished. And I think it's taken the cheapest route, but to, to, to basically cut off, uh, this plaintiff's ability... So what you're saying, Jackson State should voluntarily come into the case without raising the matter of sovereign immunity, is that what you're saying? I don't think that would be, I do not think, I think it's doing the, the most commercially, uh, beneficial thing. I do not think that it should, it should, it should, uh, it should, it should basically waive sovereign immunity in a case like this. Are your claims becoming time barred? What's your situation on that? I'm sorry? You know, it's a dismissal without prejudice. Is the situation, are you up against a time bar or something? What's going on with that? We think some of the, some of the state law claims, uh, and, and that's, I think it's gonna be difficult to sue Jackson State on a number of these, uh, things anyway. Uh, but, but with respect to, uh, most of the, most of the offenses, they've been ongoing. We, we will have, the sales haven't, haven't necessarily ceased. So while it'll be a matter of tabulating damages, uh, you know, some of those will be time barred. Some, and, and others will be more recent. They won't. Uh, it looks like, uh, I, I, uh. You have a minute and forty-two. Sure, sure. You want or you can. Uh, I. But you don't have to. It's up to you. I, I think I want to wrap up, uh, really with those, you know, all of the cases that Your Honors have been cited to, uh, they all involve the compulsory joinder of a plaintiff, almost all of them. Uh, anything that, that doesn't involve the compulsory joinder of a plaintiff deals with someone who has well-established rights, probably a licensed mark holder. Um, there's just too many concessions that have been granted here. I think that, uh, that the misappreciation of what constitutes the type of, uh, interest, the type of ownership interest, um, uh, is something that takes, uh, a longer look, a bigger look, and I think that, uh, the court's misappreciation of, uh, what Jackson states, uh, ultimate inability to defend itself constitutes manifest error and deserves reversal. Thank you. Thank you. You've saved time for rebuttal. Good morning, Your Honors, and may it please the Court. I'm Benjamin Yonke. I represent Collegiate Licensing Company, or CLC. Uh, let me begin where we left off, which is the appropriate standard of review. Ordinarily, I wouldn't spend a lot of time with it, but for the fact that the District Court has been insinuating that, that the, uh, de novo standards should apply here because they contend that the District Court made an erroneous statement of law or that they relied on an erroneous statement of law, which is their contention that this case stands for the proposition that a, uh, that a trademark owner slash licensor is always Rule 19 required. That's not what the District Court held in this case, nor did the District Court rely on any cases standing for that proposition. Quite to the contrary, the District Court dutifully engaged in a fact-specific, multi-factor analysis to conclude that Jackson State University is indeed a Rule 19 required party because it has contended that it owns an interest in the trademark issue and the ILO. And furthermore, this case cannot proceed in equity of good conscience in absence of Jackson State University. This is why, uh, Judge Jolly, in your Pulitzer decision, you wrote extensively about the nature of this analysis, how it's the District Court and not the Circuit Court who's ordinarily in the best position to decide these issues. So, similar to the commentary that the Circuit Court made in Gensetics, they said we reject the attempt to manufacture a legal error here. Gensetics cannot deny that the District Court did indeed conduct a factor-by-factor Rule 19 analysis, and that's precisely what we had here. This wasn't a two-page opinion. It was an fact-specific. The plaintiffs boldly claimed that there aren't any cases anywhere in the country standing for the proposition that a trademark owner-slash-licensor can be Rule 19 required. They're missing the several cases that we cited in our brief, including Marcus, Jaguar's Cars, Innovative Marketing, perhaps most compelling, the Diaz case. Now, again, every one of these cases is fact-specific, and every one of these courts engaged in their own fact-specific analysis. But I want to talk about Diaz just because it is just so squarely on point with the facts in this case. It's well-written, and it's highly instructive. The Diaz case, like this case, involved a university that claimed ownership in a trademark. There was the University of Alabama, and here, of course, is Jackson State. The trademarks in both cases, and in the Diaz case, were not registered with the USPTO. These were universities that claimed decades' worth of common law trademark rights into the DILM mark in this case, and in that case, it was that classic houndstooth pattern associated with the University of Alabama, where Bear Bryant would used to wear those hats cut out in the silhouette of an elephant. And in this case, as in the Diaz case, you had a plaintiff, an enterprising, Johnny-come-lately and lucky plaintiff, who managed to sneak through a registration with the Trademark Office, despite having no connection whatsoever with either Jackson State or with the University of Alabama. And in this case, just as in the Diaz case, the plaintiffs didn't sue the universities. The plaintiffs sued the licensees. And in this case, just as in the Diaz case, the named defendant licensees filed Rule 19 motions. They said, stop. Wait a minute. We're relative newcomers to this mark. We've just been licensed the rights to use this mark. We're in the case of CLC to administer the Who are we to defend these universities' trademark rights? It's the universities who are uniquely proposed with the institutional knowledge to determine the priority as to who owns the trademark rights. And Judge Alrod, going back to your point, priority is indeed important in this case. If the plaintiffs can't prove priority, they lose on all fronts. And in this case, just as in the Diaz case, the courts took cognizance of the fact that there was real, live, extant dispute as to who owned the trademarks. The non-named universities claimed that they owned the trademarks. And in both cases, the district court observed that there was a pending TTAB cancellation proceeding brought by the universities to shut out those plaintiff's trademarks. So in Diaz, the court held an injunction prohibiting infringement by the defendant who claims the right to use the mark only by way of a license from the University of Alabama will be tantamount to a finding that the University of Alabama has no ownership interest in the mark and that would be clearly prejudicial to the University of Alabama if the case were to proceed in its absence. The exact same thing is true here. I want to speak for just a couple of minutes on the case relied upon almost exclusively by the plaintiffs in their brief, the WM International case. This is a district court out of New York where the court reached a different conclusion in its own Rule 19 analysis. I think there's four points of observation. Number one, WM International does not stand for the proposition that a trademark owner slash licensor is never Rule 19 required. That case, just like this case, didn't make any sort of broad pronouncement of law. Number two, that the law that was relied upon extensively by WM International was for the proposition that the plaintiff in an IP infringement suit does not have to sue all joint tour pieces. There's about a dozen cases that the plaintiffs cite for that proposition in their brief. They added another couple this past Friday night. You know what? We don't disagree with them whatsoever. It stands to reason that a plaintiff faced with multiple infringers, let's say it's a licensee that makes a million dollars a year selling t-shirts and there's another licensee that only makes ten dollars a year selling butt bottles. Of course, the law doesn't require the plaintiff to corral all of those alleged infringers in one courtroom before it can proceed, but it's a very different case. Another subspecies of those cases involving trademark owners and even so, it's still not a blanket rule. The courts dutifully have to engage in their own Rule 19 analysis. The third point of distinction is that in WM International, the plaintiff actually named the trademark owner, the licensor. The plaintiff was actually interested in thwarting the infringement and cutting it off at the head. It wasn't just suing the licensees, it was trying to sue the licensors, but there were some service issues in that case. There was practical limitations on joining this foreign named defendant to the United States case and in light of those considerations, the court took cognizance of and weighed the equities to note that the plaintiff didn't have an adequate remedy to allege its trademark infringement case. Critical distinction with this case, which the plaintiffs completely ignore. There is another remedy. If they really do believe in their heart of hearts that they have superiority and priority in their trademarks, they can sue Jackson State, CLC, and one or many or all of the licensees pick and choose in state court in Mississippi. Of course, they've chosen not to do so because they know that if paired off with Jackson State University, which does indeed in its declarations claim that they've been using this mark for 80 some odd years, they're not going to prevail because the artifice will be exposed. With that, the plaintiffs make much of whether this is a real interest that Jackson State claims or whether it's merely speculative. The district court, in its opinion, this is a ROA 563, citing to the Declaration of Jackson State at ROA 95, pointed to what we call the petition process, that there once Jackson State was alerted to the fact that these plaintiffs, Johnny come lately and lucky as they were, managed to sneak by a registration with the trademark office, they filed a petition to cancel the current existing registration, which is only for t-shirts, and the pending application for a slew of other goods spanning nine different classes of goods and services. This is a real, live, present, extant dispute. This is a far cry from the Ohio case, though it's for the proposition that it's merely speculative if the defendant merely shrugs its shoulders, if you will, and questions the validity of the plaintiff's trademark. That's not what's happening here at all. It's a far cry from the automation support case cited by the plaintiffs where there was some speculation as to some future event. There is no future event, there's a real event where Jackson State is trying to defend its own trademark rights with the TTAB, just like the Diaz court held. It's clear the university claims an interest in the trademark right issue, which is not frivolous, is indicated by the fact that the university has issued the cancellation receipt. What effect does the indemnity clause in the agency agreement have on the potential prejudice to the university? I'm glad you brought that up, and the indemnity clause you're referring to is at ROA 160, and the plaintiffs repeatedly cite to sections 8b, 8c, and 12. They say that this indemnity clause stands for the proposition that for allegations of trademark infringement. There's no better way to say this other than that's not what it provides at all, and I wish I had time to go line by line. I'd urge you to read it, but that's not what it says. The agency agreement at a 30,000-foot level, this is what it says. It assists universities in the management and administration of their license programs to vet quality licensees, to run the royalty process, and in some instances to enforce, with the benefit of the universities, their trademark rights, so that if there's some garment manufacturer who's unlicensed, then CLC will assist the universities to thwart that sort of infringement. This agency agreement is not an IP infringement insurance policy, and of course it isn't. Why on earth would CLC sign up for such a liability? So the next time some enterprising plaintiff comes through the USPTO, gets lucky, and gets a registration for hook them horns or CLC is not in the position of defending the University of Texas or the University of Alabama against such allegations of trademark infringement against some enterprising plaintiff who has no earthly connection whatsoever with those universities. That makes perfect sense. Now the plaintiffs have gone out of their way to say what we're asking for in this case is really narrow. This is just about trademark infringement. It doesn't have any effect whatsoever on the rights that the parties have with respect to the pending cancellation proceeding. They say any rights JSU has with the TTAB are unaffected by this case. That's simply not true. There's a number of parallels, Judge Jaller, to your opinion in Pulitzer, where the non-moving parties were trying to make precisely that argument. In that case, you had an underlying state court case that was taking its time, and some of the parties to that case decided that they were going to file their own case in federal court against some, but not all, of the same parties. There were indeed overlapping issues of law and fact, and the plaintiffs tried valiantly to say no, there's nothing about this case that's going to affect the other case, and Judge Jaller, you called them on. You said there are indeed overlapping issues. It's not as simple as that. You said that the case law under Rule 19 has recognized that the establishment of a negative precedent can provide the requisite prejudice to the absentee, and that Rule 19 allows us to recognize the fact that the absentee may be harmed by the federal court's resolution of this case. And while technically speaking, if the federal court were to arrive at a decision quicker than the underlying Louisiana state court, you observe that technically it's not going to be binding on the other court, but we would be foolhardy to think that one court isn't going to give some deference to another court who is deciding virtually identical issues of law and fact. The same is true here, by the way. If the plaintiffs get lucky in this case and win, let's say, for example, they get a declaration as to the validity of their trademarks, or as to the invalidity of Jackson State's trademarks, who are we to pretend that they're not going to use that win as some sort of evidence in the other pending TTAB proceeding? But let's forget for a second the case law. Let's look at the effects and the inconsistent obligations that will befall the parties in this case alone. If the plaintiffs are successful in obtaining an injunction against Jackson State for the administration of its trademark rights, and the licensees who are using the marks and printing t-shirts and other garments and whatnot, then immediately they will be faced with a position of not performing under their various contracts with Jackson State. Precisely the sort of inconsistent obligation that Judge Jolly, you counseled against. You said practically there is a substantial risk that the absentee may face double liability as a result of this lawsuit. Now, interestingly, I learned just yesterday in checking the TTAB proceeding, I understand the system in the record, and if you provide a 26-F filing, we'd be more than happy to do so. Mr. Bordenhave in that case told the board that it was indeed, this case was indeed related, and asked to stay the proceeding. I don't think you should tell us what's not in the record. Sure. But the fact that there is indeed still yet, as the district court recognized, an ongoing petition process, we found it was particularly relevant that Jackson State University claimed an interest in this mark, that if this case were to proceed in equity and good conscience, that its rights would be affected in its absence. Now, interestingly, the plaintiffs go to say, as to the license agreement, that CLC is every flattered by that, but if you look at the agency agreement, and to your honor's question, that's not what its obligations are whatsoever. They point to, for example, the smack apparel case. The last time CLC was before this court, that was the case that concerned color combinations in connection with trademarks and how, under certain circumstances, those colors are protectable. What's interesting about that case is that CLC was indeed there to protect the university's interests. It was also there, LSU, University of Oklahoma, USC, Ohio State. Who's not here in this case? Jackson State University protects its interests. At the end of the day, we're dealing with an abuse of discretion standard, a detailed opinion where every single factor militated in favor of dismissing this case to protect Jackson State University. In no event does the court abuse discretion. Thank you, counsel. We have your argument. Thank you. Mr. Tolar. Good morning, your honor. Kent Tolar on behalf of all licensees. I think Mr. Ianchi has covered most of the issues in this case. However, I'd like to add a couple others on behalf of the licensees. The central issue in this case is ownership of the mark and Jackson State is going to, is asserting that it has over 80 years of common law use of the trademark in question. And there's no way that the licensees can be burdened with trying to prove 80 years of common law use of an absent party. They would need access to invoices, advertising expenditures, you know, all these other evidentiary documents that they would have to have access to and they don't unless Jackson State's here. And the inconsistent judgment issue is particularly important with respect to the licensees. The licensees could litigate in the district court and lose and be deemed guilty of seeking indemnity or contribution or some other cause of action against Jackson State that would have to do so in state court. And if they lost that one, then they would lose both ways. And the licensees are simply small retailers who really don't have any control or vested interest in Jackson State's trademark other than being able to use it and sell their merchandise. So they would be particularly vulnerable to a proceeding that continues without Jackson State present. And also, if the licensees were to lose in the district court here, then Jackson State could proceed and continue to license the mark to other retailers, competitors, and that would put them at and the federal district court here would have no impact whatsoever on Jackson State, only on the licensees and CLC. So for that reason, we think we reiterate that Jackson State is definitely an indispensable party under Rule 19 for those reasons and those stated by Mr. Yonke. So that's all I have unless there are any questions. Thank you. Thank you. Mr. O'Reilly, you said time for rebuttal. Up to you. To be honest, to address, not that there was a parade, but some of the horribles Mr. Yonke described, what would happen if this case proceeded? What would the plaintiffs do elsewhere? The Jetty case clearly describes this. The would-be mark owners' rights before USPTO, before TTAB, are not effective. There is no preclusive effect of an infringement which basically pits my client's rights against the infringer's rights. Jackson State, we don't have anything in the record that shows us that Jackson State sells any of these things or even licenses them. TAB 6 is void of the ILO and we have admitted its applications for its Jackson State did not start using these marks commercially until two years ago. Robin, is your position, though, that Jackson State has no interest whatsoever to protect in this proceeding? My position is that its interest in protecting in this proceeding is insufficient to render it a required party because it has adequate measures to do so elsewhere which are completely infected by this. Any detrimental effect would be between Jackson State and CLC, which plenty of cases have said that the potential indemnity claims, I just cited one from the Eastern District of Texas in my 20HA letter, that contribution indemnity figures between licensees and licensors don't What about the sovereignty interests of Jackson State? I'm not sure I understand that. Well, I mean, they have not only the interest of protecting their trademark in the sense of whatever defenses may be available under the trademark laws, but they also have the principle of sovereignty and immunity. That is that this is a slogan of a state, of an institution that enjoys a state immunity, a sovereign immunity, and that any kind of infringement on that slogan will have an effect on the sovereign immunity interests of the state itself. To put a point on it, Your Honor, that's just what Jackson State says. The record in this record talks about, there's actually, I believe it's at tab 8 or tab 9, I believe it's tab 8, the non-final office action. USPTO basically said we don't care what were in your hymnals, we don't care what were in your programs from way back when, and we do have record evidence that 2010 was the earliest. This is a slogan that this school has been using for a half decade. Not in commerce, Your Honor. Well, but it's a slogan that they have been using. Of a state institution, and it just seems to me that any kind of infringement upon that slogan or that mark threatens the sovereignty interests of it as a state institution. I think that Jackson State certainly has a sovereign interest in not being pulled into disputes like this, but in terms of when it jumps into the arena. It has a sovereign interest to protect. I think, I think, Your Honor. Sovereign immunity and the principle of sovereign immunity protects those interests. That's where I think is a consideration to you. I mean, it may not be determined to. Your Honor, I think the point, the point's well taken and, but in this instance, Jackson State was required to, if it wants to own intellectual property, it's treated just like everyone else here. It has a remedy outside of district court. Most of the, the lower level cases will, will basically bear out that it's not the type of litigant that is necessary. These aren't the types of. In answer to Judge Jolly's question, you said Jackson State says that it has an interest in its hymnals and it's this and that. Just by answering the question in that way, you're telling us Jackson State's position that is relevant for this dispute. Because if you're going to argue that no, that hymnal thing is not good enough and that the other proceeding that you're, you're bringing in the other proceeding, which we said, you know, anyway, but you're bringing in the other proceeding and you're talking about what is Jackson State's interest just to answer the question. So it, that seems to me to manifest that Jackson State's interest matters here. It, my, my time is up. You may answer the question. Judge Elrod, at, in this record, uh, in the non-final office action that USPTO sent to Jackson State, they themselves said, we don't care about your hymnals. We don't care about any of that because we want to know when you use this in commerce. And so I apologize for bringing in, but this was, this is all in the record. But what I'm saying is we have to, we have to do that too. The court, I mean, the district court would have to do that to decide if that matters. Yes, Your Honor, and I think that's where, I think that's where we, we have a deviation between the law and what the district court judge appreciated because Jackson State's interests are to create and protect its marks and they do so in USPTO and TTAB, which they're doing unimpeded. This matter shouldn't have been dismissed. The parties below should proceed even to Jackson State's absence and the failure of this, of the plaintiffs to proceed in that manner constitutes an abuse of discretion. Thank you. Thank you very much, Mr. Rose. We have your argument.